Sangernetta MASON, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 93–1111.

United States Court of Veterans Appeals.

June 26, 1995.

Sangernetta Mason, pro se.

Mary Lou Keener, Gen. Counsel; Norman G. Cooper, Asst. Gen. Counsel; R. Randall Campbell, Deputy Asst. Gen. Counsel; and Deborah W. Singleton, Washington, DC, were on the brief, for appellee.

Before FARLEY, MANKIN, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, veteran Sangernetta Mason, appeals a September 10, 1993, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to an effective date, prior to February 1, 1989, for an award of service connection for schizophrenia, paranoid type. Both parties have filed briefs, and the appellant has pending a December 8, 1994, motion for oral argument. For the reasons that follow, the Court will affirm the BVA decision in part, vacate the decision in part, and remand a matter to the Board for readjudication. The Court will also deny the appellant's motion for oral argument.

## I. Background

The veteran served on active duty with the United States Air Force (USAF) from January 1977 to October 1978. Record (R.) at 24. An October 1976 service medical record (SMR) prepared for USAF enlistment showed no history of any problems, including depression, excessive worry, or "[n]ervous trouble of any sort". R. at 26. The veteran noted that she had never been treated for a mental condition. R. at 27. A clinical evaluation at induction showed no abnormalities. R. at 28–29.

A September 1977 SMR from the Mental Health Service at a USAF Hospital reported that the veteran had experienced problems with coworkers, depression, some sleep disturbance, loss of appetite, and emotional problems concerning her family. R. at 30. Her mood was described as labile. *Ibid.* When she was seen a week later, the impression was "Depression, moderate, associated with strong emotional turmoil about family." R. at 31. The report also noted that her "[a]ffect was labile and at times seemed inappropriate". *Ibid.* A day later she was evaluated again on referral, and it was reported that she "appeared oriented[,] manifesting no symptomatology of mental or emotional dysfunction of a significant nature such as to interfere with job performance" and that she had experienced difficulty with her family and with relationships. *Ibid.*

A December 1977 SMR reported that the veteran had complained of severe headache, being irritable and nervous, and crying. R. at 33. The impression was "[a]nxiety reaction" and "[h]ysterical reaction (?)"; she was given Valium and afterward had "laugh[ed] and cheered up". R. at 34. An April 1978 SMR noted that she had experienced periodic depression which reportedly related to difficulties with a boyfriend, and that her mood and affect were "inappropriate given concerns noted". R. at 35. On the same day, psychological testing was administered (*ibid.*), and the results, contained in a July 1978 SMR report, revealed that she had "some passive-aggressive tendencies ... with some difficulty in dealing constructively with normal feelings of anger and hostility evolving out of interaction with others". R. at 38.

It also reported that "there was no evidence of significant and diagnosable mental or emotional dysfunction"; "no indications overtly of *cognitive process dysfunction or impairment of logic, memory, abstraction or judgment*"; and "no indication of significant pathology". *Ibid.* The behavior by the veteran was attributed to continued frustration in her job situation and personality difficulties with her supervisors. *Ibid.* The psychiatrist stated that he could not rule out "the existence of ... realistic external pressures as a contributing factor." *Ibid.* The report noted uncertainty as to the cause of the veteran's difficulties, and recommended that she be monitored by her unit. R. at 39.

In July 1978, USAF physicians examined the veteran at the request of her squadron "in order to ascertain the role of mental/emotional factors in recent sporadic behavior". R. at 37–38. An SMR report noted no "overt symptoms of severe emotional or psychiatric disorder". R. at 37. An August 1978 separation medical history report prepared by the veteran identified many problems, including headaches, depression, and excessive worry. R. at 40. A September 1978 separation medical examination report showed normal psychiatric findings as part of its clinical evaluation. R. at 42.

A November 1979 Department of Veterans Affairs (VA) record prepared by a school official from the Miami Skill Center reported that the veteran's enrollment there had been terminated because of excessive absenteeism since August 1979 and "unacceptable behavior by a trainee". R. at 70, 72. On December 15, 1982, the veteran filed a claim with a VA regional office (RO) for VA disability compensation for mental disorder and depression. R. at 75. The application noted that she had been receiving medical care at the VA Medical Center (MC) in Miami, Florida, since December 9, 1982. R. at 76. That same month, she submitted to VA a statement noting that she was then hospitalized for depression and a nervous disorder. R. at 80.

In May 1983, VA received a December 1982 medical report from the Miami VAMC which showed a diagnosis of "[s]chizophrenia chronic paranoid type manifested by auditory

hallucinations, decreased affect, persecutory delusions with paranoia ideas of reference, neologisms, and bizarre posturing." R. at 82. (Neologism is "[a] new word or phrase, or an existing word used in a new sense; in psychiatry, such usages may have meaning only to the patient or be indicative of his condition", STEDMAN'S MEDICAL DICTIONARY 1029 (25th ed. 1990).) She was prescribed lithium carbonate, Loxitane, and Cogentin and was released to her father in Mississippi. Discharge plans included followup treatment in Mississippi. R. at 84.

A February 1983 statement from the veteran informed VA that she had been admitted to a VAMC in Alabama in January 1983; that she was claiming service connection for, inter alia, her "nerves"; and that she was requesting that her claims file be transferred to, and established at, the Montgomery VARO. Supplemental (Suppl.) R. at 1. She gave her address as 1319 Lawrence St., Selma, Alabama 36701. *Ibid.* A March 1983 letter from the veteran to VA stated that while she was in the USAF she had held six jobs in the span of one year and eleven months, and that she could not keep a steady job after she had received an abortion in October 1977. Suppl.R. at 4. She stated that she could not get along with her peers, could not remember things, and could not obey her supervisor; that she "was mentally ill at the time"; and that since her discharge in November 1978 she had been through nine jobs and not held any for longer than two months. *Ibid.*

A May 1983 RO decision denied entitlement to service connection for nervous condition, "schizophrenia, paranoid type, competent", and concluded: "Psychiatric evaluations while in service failed to reveal any evidence of a psychiatric disorder. There is no reasonable basis to conclude that schizophrenia, paranoid type, diagnosed more than 4 years after discharge had its inception in military service." R. at 87, 88, 90. The decision noted that the veteran had been admitted to the VAMC in Tuskegee, Alabama, in January 1983, but that a report had not yet been received. A June 1983 VA letter, notifying the veteran of the decision, was sent to her at the Selma address. R. at 90.

In June 1983, the RO received the January 1983 hospital summary report from the Tuskegee VAMC. It revealed a diagnosis of schizophrenia, schizo-affective type, and stated that the veteran had been admitted because of auditory hallucinations, mood fluctuations, difficulty sleeping, and irritability. R. at 93. When discharged in May 1983, she "was well stabilized" and "free from psychotic symptoms" but had a guarded prognosis and "moderate social and industrial impairment". *Ibid.*

An October 1984 statement from the veteran enclosed SMRs previously of record, and requested that a personal hearing be held and that records from the Tuskegee VAMC be obtained. R. at 100. An October 1984 hospital summary report from that VAMC stated that the veteran had been admitted "because of hyperactivity and irritable behavior" and noted that she had been hospitalized for approximately two months. R. at 149. The diagnosis was "[s]chizo-affective [d]isorder with hypomanic feature". *Ibid.* A December 1984 hospital summary report from the VAMC in Decatur, Georgia, diagnosed her with "[b]ipolar disorder" and stated that she had had "four prior psychiatric hospitalizations dating back to 1982". R. at 119. At the initial interview, she stated that she had experienced "psychiatric problems for several years" and that her "psychological difficulties" and "problems with [her] nerves" had started while she was in service, and that in August 1977 she had undergone an abortion and "frequently became very depressed over this and cr[ied] for extended periods of time". R. at 119–20. She related that her hospital experience had begun in December 1982 "when she was arrested in [the] Miami airport because she was wandering around the streets". R. at 122. Upon hospital discharge, she was noted as being "competent for VA purposes" and was prescribed medication. R. at 123–24.

In January 1985, the veteran testified under oath before the VARO in Atlanta that she had not had any problems with her nerves prior to service (R. at 127), had not had any problems with basic training, and

had gotten along with her sergeants and everybody (R. at 129). She testified that after basic training had been completed she had taken classes for Air Traffic Control, but could not keep up so was transferred to another base; and that thereafter she had become ill, withdrawn, and depressed. R. at 129–31.

She further testified that after she was discharged she had "drifted around for a few years" as a street person, living in abandoned houses (R. at 134–36); that she had been arrested in Miami, Florida, and brought to a VA hospital where she had been treated for "hysterical reaction anxiety" (R. at 135, 138); that she had experienced a nervous breakdown on a bus while in service (R. at 137–38); that she had "got real ill" and they had to stop the bus and take her to the hospital; that she had had a hysterical reaction (R. at 138); and that she did not know if she had been treated within a year after separation because she "was out of [her] mind . . . was completely lost, [her] mind was lost" (R. at 140); and that she was unable to work (R. at 146). (The hearing transcript identified her address as 921 Howell Mill Rd., Atlanta, Georgia 30318, R. at 126.)

After reviewing the veteran's SMRs and postservice medical records, including the latest diagnosis of bipolar disorder and her January 1985 testimony, the RO, in February 1985, confirmed the May 1983 RO denial of service connection for a nervous condition. R. at 153. A March 1985 VA letter, notifying her of the RO decision, was sent to her at 921 Howell Mill Rd., Atlanta, Georgia. R. at 157. In June 1985, VA received a Declaration of Marital Status from the veteran in which she identified her address as 1520 Union St., Selma, AL. 36701. Suppl.R. at 10. In July 1985, she filed a Notice of Disagreement (NOD). R. at 157. In August 1985, the RO issued a Statement of the Case (SOC) to her at 1520 Union Street, Selma, Alabama 36701. R. at 160–63. The records do not reflect that she filed a VA Form 1–9, Substantive Appeal to the BVA (1–9 Appeal).

October 1985 VA medical records from a VAMC in New York stated that the veteran had requested refills of her medication and included a diagnosis of "schizophrenia, un-diff[erentiated] type" (R. at 165–66) and referred her to the Lincoln Hospital, Medical Health Clinic, in Bronx, New York. R. at 167. A November 1987 letter from the veteran stated that since she had last filed her claim she had been in VAMCs in Selma, Alabama (June 1985), New York (November 1985), Miami (June 1986), and Houston, Texas (October 1987), as well as St. Elizabeth's Hospital in Washington, D.C. (November 1987). R. at 173, 177. The letter stated that she wished to reopen her claim and had enclosed copies of two letters from in-service supervisors. Later that same month, the veteran sent VA a letter enclosing articles about manic depressive illness. R. at 181–97.

The letters enclosed with the veteran's November 1987 letter were as follows: A June 1977 letter from Hardy Perry, USAF (although his rank is not stated in the letter, it was apparently sergeant, see R. at 278) retired, stated that he had supervised the veteran for approximately 6 months during 1977, that she "seemed like she was an OK person at [illegible] times[;] then again, she was not OK", and that "[s]ome morning[s] she would come to work [one way and] then some morning[s] she would come to work completely different." R. at 174. A November 1987 letter from David Brown, USAF, Sergeant, Inventory Section, stated that the veteran had worked for him during 1978; that "during this time frame she [had] under[gone an] extreme mental disorder problem here in the 381st Supply Squadron, McConnell Air Force Base, KS 67221"; that she had "displayed a complete inability to adjust with her co-workers and supervisor in the Bench Stock Support Unit"; and that her continued "negative attitude toward her peers and supervisors [had] forced [him] to send her over to [a m]ental health clinic, to seek further help". R. at 175. In his opinion, she was a "disturb[ed] individual [who] need[ed] mental treatment". He stated that "[i]t began in the United State[s] Air Force and the military should take care of this problem by assisting [her] in any way it can". R. at 175–76.

A December 1987 statement submitted by the veteran stated that she wished to "appeal" the decision to deny her claim. R. at

179. Her address was noted as 2700 Martin Luther King, Jr., Avenue SE, Washington, D.C. 20032. A January 1988 handwritten note on this statement stated that it was not a valid NOD and that the veteran should be told that the appeal period had expired. *Ibid.* A February 2, 1988, VA letter, notifying the veteran that her appeal period had expired and that new and material evidence was needed to reopen her claim, was sent to her at the Washington, D.C., address. R. at 200.

On February 10, 1988, the RO confirmed the May 1983 RO decision denying service connection for a nervous condition. The decision noted that the veteran had "submitted a packet of information that pertains to manic depressive illness" and that the information "is not medical evidence on the veteran and therefore does not constitute new [and] material evidence". R. at 202. A February 18, 1988, VA letter, notifying the veteran of the RO decision, was also sent to her at the Washington, D.C., address. R. at 204.

In January 1989, VA received from the President of Selma University a December 1987 letter stating that the veteran had been a student there from August 1983 through August 1985, and that although she had been a "superb student" she would "walk out (quit school) without withdrawing from classes or informing the ones in authority of her location". R. at 207. The letter noted that her reactions at times were that of a "very abnormal person", that she "is not mentally able to carry a full load of classes", and that her "attitude" was "bazaar [sic]". *Ibid.*

A January 1989 letter from the veteran stated that she was enclosing letters from her mother, her former military supervisors, and the college she had attended. R. at 211. The letter from her mother stated that ever since the veteran had come back from service she had "behaved different from her home training and could or would not cooperate with any [of] her family". R. at 212. The two letters from her military supervisors are duplicates of those submitted in November 1987. R. at 174–76, 213–15. On February 1, 1989, VA received an undated letter from the veteran, inquiring as to the status of her claim, stating that she had sent in "some

papers from my supervisors I had while I was in the Air Force", and requesting that a response be sent to her at 1057 Hoe Avenue, # 8C, Bronx, New York 10459, where she would be until June. R. at 210.

An undated letter from the veteran, with the New York return address noted above, received by VA in March 1989, stated that she had spoken with VA on January 30, 1989, about the status of her claim and had not yet received a response. R. at 217. She stated that she had "written several letters to the VA" but had "never received a reply" and that she had called and written in "a change of address". *Ibid.*

A May 1989 VA examination report included a diagnosis of bipolar disorder, manic phase, and noted that she was prescribed medications and discharged. R. at 220–21. An October 1989 VA medical history report noted that she had been hospitalized several times for psychological problems and that her chief complaint then was "psychological problems" and "[t]ordia [d]iseonisia". R. at 224. An October 1989 VA evaluation report prepared by Dr. Kouf, a psychiatrist, stated that it was "unclear from the review of the records if the [veteran] has ever had a period of psychiatric stability without functional impairment since discharge from the armed services". R. at 225, 227. The report contained the following impression: "Manic episode vs. schizoaffective disorder"; "currently extremely disabled by her psychiatric illness, unable to work, only marginally able to care for herself due to her psychotic disorganization"; "unclear to what extent a better functional status could be restored if she received appropriate treatment". As to her financial competency, Dr. Kouf reported that the veteran is "extremely impaired by her psychiatric symptoms and, as part of her psychiatric disorder, may have sufficient impairment in her judgment. . . . I would have to say that she should be considered incompetent." R. at 226.

In January 1990, an RO confirmed and continued the May 1983 RO denial of service connection for nervous disorder. R. at 229–30, 232. The decision noted that the RO had considered Dr. Kouf's October 1989 VA report and statements from the veteran's mili-

tary supervisors and mother. *Ibid.* In January 1990, the veteran requested a "statement of my case in regards to the denial of my claim for service-connected disability". R. at 235. This was construed by VA as an NOD.

In March 1990, she submitted October 1985 records from a VAMC in New York showing a diagnosis of schizophrenia. These records are duplicates of records already in her file (*compare* R. at 238–40 *with* R. at 165–67), and November 1989 VA records indicating a bipolar disorder (R. at 242–43). A March 1990 RO decision confirmed and continued the May 1983 denial of service connection for a nervous condition, concluding that these records did not constitute new and material evidence. R. at 245. In April 1990, the RO issued an SOC.R. at 247–51. In July 1990, the veteran filed a 1–9 Appeal. R. at 255. In August 1991, she testified under oath before the BVA in Washington, D.C., as follows: before she had entered the military she had not seen nor been treated by a psychiatrist for any type of emotional problem (R. at 272); sometime in 1977 she had experienced an anxiety attack while riding on a bus and had been taken to a hospital and given Valium (R. at 274–75); she had worked with Sergeants Brown and Perry while in service (R. at 278); she had been released from the Miami VAMC the day before, and was currently taking medications (R. at 282); the first time she could remember having received medical treatment for a nervous disorder was in 1982 or 1983 (R. at 283); and she knew that her condition had "occurred" during her military service (R. at 288).

In November 1991, the BVA granted service connection for a psychiatric disorder. R. at 291–95. The Board found that the evidence submitted since the last denial in February 1988 was new and material and that, when considered with evidence previously of record, reasonably established that the disorder had its onset during service. R. at 292–93. The Board decision stated that the following "new" evidence, when combined with that previously of record, "is convincing that the emotional difficulties experienced by the veteran in service represented early manifestations of the later diagnosed psy-

chotic illness": the lay statement from her mother; the lay statements from two in-service supervisors; the Selma University President's statement; and her August 1991 sworn testimony before the Board. R. at 294–95.

A November 1991 RO decision, pursuant to the Board's November 1991 decision, assigned a 100% rating, effective from February 1, 1989, the date the veteran had filed a claim to reopen. R. at 300–01. In May 1992, she submitted a statement requesting an effective date as of her discharge date. R. at 308. This statement was construed by VA as an NOD. R. at 311, 313. The RO issued an SOC. R. at 312–14. In January 1993, she filed a 1–9 Appeal requesting that her file be forwarded to the American Red Cross for representation. R. at 316. In March 1993, the veteran's American Red Cross representative submitted a statement on her behalf contending that "due to the severity of her disability[, the veteran] was unable to properly take care of her affairs to establish service connection" and that "a person with a nervous disorder as severe as [the veteran]'s would probably have been incapable of pursuing her claim properly to establish service connection". R. at 320. In a May 1993 hearing before the BVA (R. at 323–36), she testified under oath that she had never received a letter informing her that her 1982 claim had been denied, and therefore had not followed up on that denial. R. at 327–28. She stated that in 1983 she had moved back to Alabama (R. at 330) and that the last time she applied for benefits she had lived in New York, "staying in hospitals, [in] shelters, [with] friends, [on] trains, ... [a]ny place to sleep." R. at 331. In a closing statement, the veteran's representative stated: "During these difficult times in her life following discharge, she was unable to comprehend what was going on with herself and her surroundings and we contend that due to the difficult times in her life at that particular time, she was unable to fulfill the appeal process and therefore we feel that the [ ] effective date should go back as [of] April '82." R. at 333.

In the September 1993 Board decision here on appeal, the Board denied entitlement to an effective date prior to February 1,

1989, for the award of service connection for schizophrenia, paranoid type. R. at 12. The Board found that the RO denials of service connection for a psychiatric disorder in May 1983, February 1985, and February 1988 were final, and that the veteran had been notified of each decision at her latest address of record, but that she had not filed or completed timely appeals from any of these decision. R. at 6, 9. The Board concluded that there had been no showing of CUE in any of these RO decisions, and that the effective date for the current 100% rating was the date of receipt of the claim to reopen. R. at 7.

## II. Analysis

### A. Generally Applicable Law

The appellant contends that she is entitled to an effective date of October 1978. She can receive an earlier effective date only if there was clear and unmistakable error (CUE) in one of the final RO decisions or if one of the prior RO decisions was not final. She contends that when the RO previously decided her case, it did not consider all the evidence then of record.

■■■ The BVA is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Masors v. Derwinski*, 2 Vet. App. 181, 188 (1992); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56–57 (1990). To comply with this requirement, the Board's statement of reasons or bases must account for the evidence which it finds to be persuasive or unpersuasive, analyze the credibility and probative value of all material evidence submitted by and on behalf of a claimant, and provide the reasons for its rejection of any such evidence. *See Gabrielson v. Brown*, 7 Vet.App. 36, 40 (1994); *Abernathy v. Principi*, 3 Vet.App. 461, 465 (1992); *Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Hatlestad v. Derwinski*, 1 Vet.App. 164, 169 (1991); *Gilbert, supra*. The Court reviews BVA factfinding under a "clearly erroneous" standard; "if there is a 'plausible' basis in

the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert*, 1 Vet.App. at 53; 38 U.S.C. § 7261(a)(4).

### B. CUE

■■■ Pursuant to 38 C.F.R. § 3.105(a) (1994), "[p]revious determinations which are final and binding ... will be accepted as correct in the absence of [CUE]." A CUE claim is a collateral attack on a final RO decision. *See Smith (William) v. Brown*, 35 F.3d 1516, 1527 (Fed.Cir.1994). In order for there to be a valid claim of CUE, there must have been an error in the prior adjudication of a claim based on the record then before the RO. *See Russell v. Principi*, 3 Vet.App. 310, 313 (1992) (en banc). In *Russell*, the Court defined CUE as follows:

> Either the correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions extant at the time were incorrectly applied.
>
> ... [CUE is] the sort of error which, had it not been made, would have manifestly changed the outcome.... [It is an error that is] undebatable; so that it can be said that reasonable minds could only conclude that the original decision was fatally flawed.

*Id.* at 313. The veteran must assert more than a disagreement as to how the facts were weighed. *Ibid.* On appeal of a BVA determination that there was no CUE in a prior final RO decision, the Court's review is limited to determining whether the Board's decision on the CUE issue was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (38 U.S.C. § 7261(a)(3)(A)) and whether it is supported by an adequate statement of "reasons or bases" (38 U.S.C. § 7104(d)(1)). *See id.* at 315; *see also Porter v. Brown*, 5 Vet.App. 233, 235 (1993).

The appellant contends that she is entitled to an effective date of October 1978, the date she was discharged from service. In its 1993 decision, the Board found that there had been no showing of CUE in any of the three prior RO denials of service connection for a

psychiatric disorder—in May 1983, February 1985, and February 1988—and that the effective date for the current 100% rating was the date of receipt of her claim to reopen, February 1, 1989. R. at 7. For the reasons stated below, the Court holds that the Board's determination with respect to the 1983 and 1985 RO decisions was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. However, regarding the February 1988 RO decision, the Court concludes that the Board's failure in 1993 to consider the fact that the RO had not referred to the two statements from the veteran's former military supervisors and the impact of such statements on the Board when the Board issued its 1991 decision awarding service connection constitutes a sufficient reasons-or-bases error by the Board to justify remand on that issue. *See Russell, supra.*

■ *1. May 1983 RO decision:* The Board found that, based on the evidence of record in 1983, the May 1983 RO decision did not contain CUE. The Board noted that the SMRs showed that there was no confirmed diagnosis of a psychosis and that there was no clinical evidence linking any then-current problem to service. The RO in 1983 had before it the correct facts as they were known at the time and did not apply incorrectly any provision of law or regulation extant at that time. Accordingly, the Court holds that the Board's 1993 decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law with respect to this finding of no CUE in the May 1983 RO decision denying service connection.

*2. February 1985 RO decision:* The Board found that the 1985 RO decision did not contain CUE based on the evidence then of record. The Board noted that the additional medical records did not show that her psychosis was present in service or to a degree of 10% within one year following separation from service. The RO in 1985 had before it the correct facts as they were known at the time and did not apply incorrectly any provision of law or regulation extant at that time. The Court holds that the Board's 1993 decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law with respect to

this finding of no CUE in the February 1985 RO decision denying service connection.

■ *3. February 1988 RO decision:* The Board found that the final February 1988 RO decision was not clearly and unmistakably erroneous. R. at 11. The Board noted that in December 1987 the appellant had submitted medical information concerning manic-depressive illness which was general in nature and did not contain any information specific to the veteran. The Board stated that it could not find error in "the RO's failure to hold that this constituted new and material evidence". *Ibid.* The Board failed to note, however, that VA had received two lay statements from the veteran in November 1987 (R. at 177) and that the RO did not consider, or mention, this evidence in its February 1988 decision (R. at 202). These two statements were from two of the veteran's USAF in-service supervisors who described her unusual behavior during service.

In its 1993 decision, the Board determined that the RO had *not* committed CUE in its 1988 decision denying the reopening of the veteran's claim for service connection; however, assuming that the February 1988 RO decision was in fact final (as discussed in part II.C.3., below), the Board erred when it did not consider whether the RO's failure to consider the lay statements was CUE. That the Board failed to so consider is evidenced by the Board's statement in 1993 that it "cannot find that the RO's failure to hold that this [general medical information concerning manic-depressive illness] constituted new and material evidence [so] as to warrant reopening of her claim for service connection for a psychiatric disorder to be clearly and unmistakably erroneous". R. at 11; *see Russell,* 3 Vet.App. at 319–20 (remanding to Board the issue whether the RO's failure to consider an audiometer report in SMRs was CUE under § 3.105(a)). The February 1988 RO decision stated only the following as to the new evidence submitted and reviewed: "Veteran has submitted a packet of information that pertains to [m]anic [d]epressive [i]llness. The information is not medical evidence on the veteran and therefore does not constitute new [and] material evidence." R. at 202. The lay statements were clearly in the record

yet were not referred to, and thus apparently not considered by, the RO in its 1988 decision.

As in *Russell,* here the RO in 1988 failed to comply with 38 C.F.R. § 3.303(a) (1994) which, in pertinent part, provides: "Determinations as to service connection will be based on review of the entire evidence of record." *See Russell,* 3 Vet.App. at 319. The RO committed error in failing to follow § 3.303(a) and in effect denying the existence of evidence that did exist and was a part of the claims file. *See ibid.*

The question whether this error rose to the level of CUE under § 3.105(a) is a matter to be left to the Board initially. *See Russell,* 3 Vet.App. at 320. The Board on remand must determine whether, on the entire evidence of record before the RO in 1988 (including the lay statements), the evidence establishes manifestly that the correction of the error would have changed the outcome—that is, that service connection would have resulted had the lay statements been considered. The Board's 1993 decision will thus be vacated and the case remanded on this issue.

The Court notes that the 1993 Board decision recognized that the BVA's grant of service connection for schizophrenia in November 1991 "was based on statements from her mother, statements from in[-]service supervisors, and a letter from the president of a college the veteran attended, as well as her testimony at a hearing at the Board". R. at 11. The Board on remand should consider the weight given these statements by the Board in 1991 when it granted service connection. The Court notes that the 1991 Board decision relied on these in-service lay statements in concluding that such evidence supported a showing that she "had normal behavior prior to service but has displayed numerous psychiatric symptoms since her period of active duty" and that the "the emotional difficulties experienced by the veteran in service represented early manifestations of the later diagnosed psychotic illness". R. at 295. The other evidence relied upon by the Board in its 1991 decision consisted essentially of cumulative testimony by the veteran—January 1985 hearing testimony concerning her having experienced no psychiat-

ric problems prior to service was essentially the same as the testimony she had given in August 1991—and was considered in the February 1985 RO decision denying service connection (R. at 153). *Compare* R. at 127–31, 137–38 *with* R. at 272–78; *see Russell,* 3 Vet.App. at 322 (consolidated with *Collins v. Principi,* No. 90–416 (remanding in *Collins* for BVA to readjudicate CUE claim based on misapplication of regulation where there had been no change in facts in evidence yet RO had reached different result in subsequent adjudication)); *cf. Bailey v. Derwinski,* 1 Vet.App. 441 (1991) (holding internally inconsistent BVA factfinding was reached in "arbitrary and capricious" manner in violation of 38 U.S.C. § 7261(a)(3)(A)).

### C. Finality of May 1983, February 1985, and February 1988 RO Decisions

The September 1993 BVA decision found that the May 1983, February 1985, and February 1988 RO decisions were final. The Secretary argues that the Board's determinations that all three RO decisions were final were not erroneous and should be affirmed. For the reasons that follow, the Court concludes that the evidence in the record on appeal (ROA) supports the Board's finding of finality as to the May 1983 and February 1985 RO decisions and holds that the Board's findings as to those decisions were therefore not clearly erroneous and will be affirmed. However, as pointed out below, the finality of the February 1988 RO decision is in question based on a possible request by the appellant for an extension of time to file an NOD pursuant to 38 C.F.R. § 3.109(b) (1994) as to that decision. Accordingly, the Court will *remand for the Board to address this issue* if it does not find CUE in the February 1988 RO decision.

There is a presumption of regularity that supports " 'the official acts of public officers and, in the absence of *clear evidence to the contrary,* courts presume that they have properly discharged their official duties' ". *Ashley v. Derwinski,* 2 Vet.App. 62, 64–65 (1992) (*Ashley I* ) (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)); *see Davis v. Brown,* 7 Vet.App. 298, 300 (1994);

*Ashley v. Derwinski*, 2 Vet.App. 307, 308–09 (1992) (*Ashley II* ); *Saylock v. Derwinski*, 3 Vet.App. 394, 395 (1992). In *Saylock*, the Court held that it must presume that the RO properly discharged its duties by mailing a copy of the RO decision to the "latest address then of record". *Saylock*, 3 Vet.App. at 395; *see* 38 U.S.C. § 7105(b)(1); *see also* 38 U.S.C. § 5104(a) (Secretary to "provide" to each VA-benefits claimant timely notice of any VA-benefits adjudication decision accompanied by "an explanation of the procedure for obtaining review of the decision"); *Rosler v. Derwinski*, 1 Vet.App. 241 (1991) (holding that as to adjudications made after January 31, 1990, Secretary is required by section 5104(a) to advise VA claimants throughout claims adjudication process of their subsequent appellate rights as to those adjudications).

Pursuant to 38 U.S.C. § 7105, an NOD initiates appellate review in the VA administrative adjudication process; the request for appellate review is completed by a substantive appeal (VA Form 1–9 Appeal) after an SOC is issued by VA. 38 U.S.C. § 7105(a); *see Roy v. Brown*, 5 Vet.App. 554, 555 (1993); 38 C.F.R. § 20.200 (1994). The BVA carries out appellate review on behalf of the Secretary. *See* 38 U.S.C. § 7104(a). The NOD must be in writing and filed by the appellant or a representative within one year "from the date of mailing of notice of the result of initial review or determination." 38 U.S.C. § 7105(b)(1); *see* 38 C.F.R. § 20.302(a) (1994) ("The date of mailing the letter of notification of the determination will be presumed to be the same as the date of that letter for purposes of determining whether an appeal has been timely filed."). If an NOD is not filed within the one-year time limit, the RO decision "shall become final and the claim will not thereafter be reopened or allowed, *except as may otherwise be provided by regulations not inconsistent with this title*." 38 U.S.C. § 7105(c) (emphasis added); *see Rowell v. Principi*, 4 Vet.App. 9, 17 (1993); *cf. Cuevas v. Principi*, 3 Vet.App. 542, 546 (1992) (affirming BVA decision that RO rating decision became final where claimant did not perfect appeal by timely filing 1–9 Appeal).

An NOD constitutes "[a] written communication from a claimant or his or her representative expressing dissatisfaction or disagreement with an adjudicative determination by the [RO] and a desire to contest the result"; it "must be in terms which can be reasonably construed as disagreement with that determination and a desire for appellate review". 38 C.F.R. § 20.201 (1994). *See generally Hamilton v. Brown*, 4 Vet.App. 528 (1993) (en banc), *aff'd*, 39 F.3d 1574 (Fed.Cir. 1994) (consolidated with *Hermann v. Brown*, No. 93–7091). The regulation permits an extension to perfect a claim or challenge a decision for "good cause shown," and further states:

> Time limits within which claimants ... are required to act to perfect a claim or challenge an adverse VA decision *may be extended for good cause shown.* Where an extension is requested after expiration of a time limit, the action required of the claimant ... must be taken concurrent with or prior to the filing of a request for extension of the time limit, and good cause must be shown as to why the required action could not have been taken during the original time period and could not have been taken sooner than it was. Denials of time limit extensions are separately appealable issues.

38 C.F.R. § 3.109(b) (1994) (emphasis added). Thus, the time for filing an NOD may be extended, or an NOD may be filed out of time, only when, as required by 38 C.F.R. § 3.109(b), such an extension, or acceptance of an untimely NOD, has been requested and good cause for it has been shown. *See Rowell*, 4 Vet.App. at 15.

■ *1. May 1983 RO decision.*—In May 1983, an RO denied entitlement to service connection for a nervous condition, "schizophrenia, paranoid type, competent". R. at 87. The ROA contains a copy of a June 1983 VA letter addressed to the veteran at 1319 Lawrence St., Selma, Alabama 36701, and stating that it served to notify her of the decision. R. at 90. In February 1983, the veteran had given VA this address. Suppl.R. at 1. The record does not contain any letter from the veteran indicating that she disagreed with that RO decision. At the May

1993 hearing before the Board, she testified that she had never received a letter informing her that her 1982 claim had been denied. R. at 327–28.

In its September 1993 decision, the Board considered the appellant's testimony and found that her allegation of nonreceipt of the RO decision was "not determinative". R. at 9. The Board noted that the evidence demonstrated that the notice sent to her in June 1983 was mailed to the address which she had provided about three months earlier, and was not returned as undeliverable. *Ibid.* Because the veteran did not file a timely appeal from the 1983 decision, the BVA found that the RO decision had become final. The Court concludes that the Board's findings of fact in this regard are not clearly erroneous.

█ Similar to the factual circumstances of, and presumption applied in, *Saylock, supra,* the Court, in this case, must presume that the RO discharged its duties when it mailed a copy of the May 1983 RO decision to the veteran's last known address in Alabama. The appellant's statement of nonreceipt, standing alone, is not the type of "clear evidence to the contrary" which is sufficient to rebut the presumption of regularity of the notice. *See Mindenhall v. Brown,* 7 Vet. App. 271, 274 (1994). In *Ashley I,* the Court concluded that "evidence of non-receipt of a BVA decision ... arguably may raise an inference that the decision was not mailed[,] but ... is hardly the type of 'clear evidence' ... require[d] to rebut the presumption of regularity". *Ashley I,* 2 Vet.App. at 65; *cf. Chute v. Derwinski,* 1 Vet.App. 352 (1991) (per curiam order) (where evidence showed more than mere allegation of nonreceipt, but that veteran had made inquiries to VA after decision was mailed and VA did not provide evidence of mailing of decision, presumption of regularity in BVA's mailing of its decision held rebutted). "[T]he presumption of regularity of the administrative process 'in the absence of clear evidence to the contrary' applies to the VA mailing of the RO decision in the same manner as it applies to the BVA mailing of the decision." *Mindenhall,* 7 Vet. App. at 274. Because the veteran has not rebutted the presumption of mailing of the

May 1983 RO decision and because she did not file an NOD within one year after the date of such mailing of the May 1983 RO decision, the Board's findings as to the underlying facts regarding the mailing were not clearly erroneous, and the May 1983 RO decision thus became final. *See* 38 U.S.C. § 7105(c).

**2. February 1985 RO decision.**—After an RO mails an SOC to a claimant, the claimant, in order to perfect the appeal, must then generally file a 1–9 Appeal within 60 days after the date on which the SOC is mailed. 38 U.S.C. § 7105(d)(3); *see Rowell,* 4 Vet.App. at 17. Section 7105(d)(3) of title 38, U.S.Code, provides:

> The claimant will be afforded a period of sixty days from the date the statement of the case is mailed to file the formal appeal. This may be extended for a reasonable period on request for good cause shown.... The agency of original jurisdiction may close the case for failure to respond after receipt of the statement of the case, but questions as to timeliness or adequacy of response shall be determined by the [BVA].

38 U.S.C. § 7105(d)(3); *see Bernard v. Brown,* 4 Vet.App. 384, 390 (1993) (section 7105 establishes generally a series of "very specific, sequential, procedural steps that must be carried out by a claimant and the RO ... before a claimant may secure 'appellate review' by the BVA"); *see also* 38 C.F.R. § 20.302(b) (1994) (1–9 Appeal must generally be filed within 60 days from date RO mails SOC to appellant, or within remainder of one-year period from date of mailing of notification of determination being appealed, whichever period ends later); *Roy,* 5 Vet. App. at 556 (where claimant did not perfect appeal by timely filing 1–9 Appeal and had not requested an extension of 1–9 Appeal filing period, Court affirmed Board decision finding that RO decision had become final); *but cf. id.* at 557 (Steinberg, J., dissenting).

In February 1985, the RO confirmed the May 1983 RO denial of service connection for a nervous condition. R. at 153. In June 1985, VA received a declaration from the veteran in which she stated that her address was 1520 Union St., Selma, Alabama 36701.

Suppl.R. at 10. In July 1985, she filed a timely NOD with VA as to the February 1985 RO denial. R. at 157; *see* 38 C.F.R. §§ 20.300, 20.302 (1994).

In August 1985, approximately one month after receiving the July 1985 NOD, the RO acknowledged that it had received the NOD and mailed an SOC to her at the 1520 Union Street address, the address noted in the veteran's June 1985 declaration. Suppl.R. at 10. The record also contains a November 1987 letter from the veteran which stated that she had been in a VA hospital in Selma, Alabama, in June 1985 (R. at 173), and an October 1985 New York VAMC record which stated that the veteran had been hospitalized "for 5 day[s] in August at Selma, Alabama" (R. at 165). Based on the ROA, the Court finds that the SOC was mailed to the veteran at the "latest address of record" pursuant to 38 C.F.R. § 19.30(a).

The ROA does not reflect that a 1–9 Appeal was filed after the issuance of the SOC, or that the appellant requested an extension of time within which to file her 1–9 Appeal under section 7105(d)(3). *See* 38 U.S.C. § 7105(d)(3) (time for filing a 1–9 Appeal "may be extended for a reasonable period on request for good cause shown"); *Roy,* 5 Vet. App. at 556. Since no such request had been made, express or implied, and no 1–9 Appeal had been filed, the Board's findings that the February 1985 RO decision was final and that the veteran had not completed a timely appeal from this decision were not clearly erroneous. *See* 38 U.S.C. § 7105(c); 38 U.S.C. § 7105(d)(3) (RO "may close the case for failure to respond after receipt of the [SOC], but questions as to timeliness or adequacy of response shall be determined by the [BVA]"); 38 C.F.R. § 19.32 (1994) (RO "may close the appeal without notice to an appellant or his or her representative for failure to respond to [an SOC] within the period allowed").

**3. *February 1988 RO decision.*—**In November 1987, the veteran sent VA a letter seeking to reopen her claim and enclosing copies of the two letters from former in-service supervisors. R. at 173. A December 1987 letter received by VA from the veteran showed her Washington, D.C. address. R. at

179. A February 10, 1988, RO decision confirmed the May 1983 RO decision denying service connection for a nervous condition (R. at 202), and a February 18, 1988, VA letter, notifying her of that decision, was mailed to her at that address. R. at 204.

As stated in part II.C.1, above, the presumption of regularity applies to the RO's mailing of the February 1988 RO decision to the appellant's "last known address". *Mindenhall,* 7 Vet.App. at 274. In the absence of "clear evidence to the contrary", VA is presumed to have taken the appropriate action in mailing such notice. The record discloses that the decision was mailed to the veteran at her last known address of record, and she has not rebutted the presumption of mailing of that RO decision by clear evidence. The decision is therefore final unless she filed an NOD as to that decision or requested an extension of time for filing an NOD and good cause had been shown for such extension pursuant to 38 C.F.R. § 3.109(b). *See Ashley, supra.* (The Court notes that the appellant does not specifically contend that she did not receive notice of the February 1988 RO decision.)

**▬ *a. NOD as to February 1988 RO decision:*** Sometime in late January or early February 1989, VA received a letter, dated in January 1989, from the veteran stating that she was enclosing letters from her mother, her former military supervisors, and the college she had attended. R. at 211. (It is not entirely clear when VA received the letter, but it appears to have been not later than February 22, 1989, because a handwritten note of that date stated that the enclosed letters were duplicates, R. at 211, and it appears to have been received in January 1989 because the letter from the University President had been received at that time, R. at 208.) On February 1, 1989, VA received an undated letter from the veteran, inquiring as to the status of her claim, stating that she had sent in "some papers from my supervisors I had while I was in the Air Force", and requesting that a response be sent to her in New York where she would be until June. R. at 210.

Whether the February 1, 1989, letter, submitted to VA within the one-year NOD filing

period prescribed by 38 U.S.C. § 7105(b)(1), constitutes an NOD as to the February 1988 RO decision which had been mailed to the veteran on February 18, 1988, depends on whether the letter satisfies the requirements of 38 C.F.R. § 20.201. Even read liberally (as it must be, *see Stokes v. Derwinski*, 1 Vet.App. 201, 203 (1991); *EF v. Derwinski*, 1 Vet.App. 324, 326 (1991); 38 C.F.R. § 20.201), this letter cannot be construed as an NOD as to the February 1988 RO decision because it did not indicate that the veteran had "dissatisfaction or disagreement with" that denial of her claim, and did not indicate a "desire to contest the result", as required by 38 C.F.R. § 20.201.

Even if the Court assumes that VA had received the veteran's January 1989 letter within the one-year period prescribed by 38 U.S.C. 7105(b)(1), it also cannot constitute a valid NOD. R. at 211. Reading the letter liberally (*see Stokes* and *EF*, both *supra*), it also fails to indicate that the veteran had "dissatisfaction or disagreement with" the February 1988 RO denial of her claim, or to indicate a "desire to contest the result", as required by 38 C.F.R. § 20.201.

In its September 1993 decision, the Board did not discuss whether the January or February 1989 letters from the veteran could constitute valid NODs. Although the Board erred in failing to discuss whether either letter constituted an NOD, this error was not prejudicial to the veteran because this Court holds as a matter of law that neither could constitute a valid NOD. *See* 38 U.S.C. § 7261(b) (Court shall take due account of rule of prejudicial error); *Yabut v. Brown*, 6 Vet.App. 79, 83 (1993); *Godwin v. Derwinski*, 1 Vet.App. 419, 425 (1991).

■ *b. Good-cause extension for filing NOD as to February 1988 RO decision:* In the 1993 decision here on appeal, the Board found that the February 18, 1988, RO decision was final. Although the Court holds that the January 1989 and February 1989 letters could not constitute valid NODs, the Court concludes that the written argument to the BVA in March 1993 by the appellant's representative may have constituted a request for an extension of time within which to file an NOD. In March 1993, the veter-

an's American Red Cross representative submitted a statement on her behalf contending that "due to the severity of her disability[, the veteran] was unable to properly take care of her affairs to establish service connection" and that "a person with a nervous disorder as severe as [the veteran]'s would probably have been incapable of pursuing her claim properly to establish service connection". R. at 320.

Moreover, the appellant's representative, at the May 1993 hearing before the Board, argued that the appellant's illness rendered her unable to pursue her claim through the administrative appeal process; she stated: "During these difficult times in her life following discharge, [the veteran] was unable to comprehend what was going on with herself and her surroundings and we contend that due to the difficult times in her life at that particular time, she was unable to fulfill the appeal process and therefore we feel that the [ ] effective date should go back as [of] April '82." R. at 333. On appeal to the Court, in her informal brief, the appellant stated the following: "I would say in my case there should be a new law[,] say for example a s[oldi]er gets amnesia and he comes to his self 17 years later[,] is he enti[t]le[d] to his benefits. Ladies and gentilman [sic] I like the above mention[ed] s[oldi]er was very[,] very ill and has awoke and is still very sick."

■ Pursuant to 38 C.F.R. § 3.109(b), the Secretary has discretionary authority to provide an exception to the finality of an RO decision where an NOD is not timely filed in cases where good cause for such an exception is shown. *See Corry v. Derwinski*, 3 Vet. App. 231, 235 (1992). In its September 1993 decision, the Board did not address the applicability of this regulation to the time limit for filing an NOD as to the 1988 RO decision despite the contentions made by the appellant's representative in the March 1993 written statement to the BVA and at the May 1993 BVA hearing. *See Schafrath v. Derwinski*, 1 Vet.App. 589, 592–93 (1991) (holding that BVA's failure to consider regulation (38 C.F.R. § 4.40 (1991)) governing application of compensable rating due to pain, which was "made potentially applicable through assertions and issues raised in the record", was

unlawful where BVA did not consider regulation, even though claimant never mentioned it); *see also EF*, 1 Vet.App. at 326 (recognizing that VA's statutory 'duty to assist' must extend liberal reading of claimant's statements to include issues raised in all documents or oral testimony submitted prior to BVA decision). In this case, the Board granted service connection for the appellant's psychiatric disorder, and such disability was rated 100% disabling effective from February 1, 1989, a date prior to the expiration of the one-year time limit under 38 U.S.C. § 7105(b)(1) for filing an NOD as to the February 1988 RO decision. Evidence of record includes an October 1989 VA psychiatrist's conclusion, after review of the veteran's psychiatric records, that the veteran was then "extremely impaired by her psychiatric symptoms" and "should be considered incompetent" and that it was "unclear ... if [she] has *ever* had a period of psychiatric stability without functional impairment since discharge from the armed services". R. at 225–27 (emphasis added).

In light of the above, the Court holds that the Board erred in finding that the February 1988 RO decision was final without first addressing whether a request for such an extension was made and good cause shown for such extension under 38 C.F.R. § 3.109(b).

On remand, if the Board does not find CUE in the February 1988 RO decision (as discussed in part II.B.3., above) then it is to address whether there was a request made and good cause shown for an extension under 38 C.F.R. § 3.109(b). *See Corry*, 3 Vet.App. at 234–35 (finding that claimant did not request discretionary extension pursuant to § 3.109(b)); *cf.* 38 C.F.R. §§ 20.702(c)(2), 20.704(c), 20.1304(b) (1994) ("good cause" for extension of time for submitting to BVA request for changes in hearing dates, request for change in representation, request for personal hearing, or request to submit additional evidence includes illness of appellant or his or her representative and incapacity of representative).

### D. Effective date

Pursuant to 38 C.F.R. § 3.400(b)(2), the effective date of VA disability compensation benefits for direct service connection is the "[d]ay following separation from active service or date entitlement arose if claim is received within 1 year after separation from service; otherwise, date of receipt of claim, or date entitlement arose, whichever is later." *See* 38 U.S.C. § 5110(a), (b). In this case, the veteran was separated from service in October 1978. R. at 24. The first time she filed a disability compensation claim was in December 1982. R. at 75. That claim was denied finally in May 1983. Since her original claim was not received within the one year following separation from service in October 1978, an effective date cannot be assigned retroactive to October 1978, as the appellant requests.

In its September 1993 decision, the Board found that the effective date of the award of service connection for a psychiatric disorder may be no earlier than February 1, 1989, the date of receipt of the claim to reopen. R. at 7. The Board found that the appellant had submitted additional evidence seeking to reopen her claim on February 1, 1989, and applied 38 C.F.R. § 3.400(b)(2). In November 1991, the Board granted service connection based on the evidence submitted by the veteran on February 1, 1989 (lay statements from her mother, two individuals who supervised her during service, and a statement from the Selma University President) and based on her August 1991 hearing testimony before the Board. In November 1991, the RO assigned a 100% rating, effective from February 1, 1989, the date the veteran had filed a claim to reopen. If on remand the Board decides that there was CUE with respect to the February 1988 RO decision or that an extension for filing an NOD as to that decision was requested and should be granted, she might be entitled to an effective date as early as November 1987, the date she filed her claim to reopen which formed the basis for the February 1988 RO decision. Accordingly, the Board's finding that the "date of receipt of the claim, that is[,] February 1, 1989, is the only appropriate effective date which may be assigned in this case" (R. at 11), is clearly erroneous based on the undetermined status of CUE as to the February 1988 RO decision and the possibility

that the February 1988 RO decision did not become final. That finding will thus be reversed. `

### E. Punitive Damages

█ The appellant also requests $300,000 in punitive damages. Her request for punitive damages misapprehends the nature of this Court; it is a court of law, not a court of equity. The Court cannot order the punitive type of relief she seeks. *See Schleis v. Principi*, 3 Vet.App. 415, 418 (1992).

### F. Oral Argument

The appellant has requested oral argument. However, the Court denies the appellant's motion for oral argument because oral argument would not materially assist in the disposition of this appeal. *See Beaty v. Brown*, 6 Vet.App. 532, 539 (1994).

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court affirms the September 10, 1993, BVA decision as to its finding that there was no CUE with respect to the May 1983 and February 1985 RO decisions and as to its finding of their finality. The Court reverses the BVA decision to the extent it found February 1, 1989, to be the "only appropriate effective date" (R. at 11) which may be assigned in this case, and vacates the decision to the extent that it found no CUE with respect to the February 1988 RO decision and to the extent it found that that RO decision was final. The Court remands to the Board the matter of determining whether the award of a 100% rating should, pursuant to 38 U.S.C. § 5110(b)(2), have been made effective on the date of the November 1987 claim based on CUE or based on the 1988 RO decision's not being final by virtue of a possible "good cause" extension for filing an NOD. On remand, if the Board finds CUE in the 1988 RO decision or finds that "good cause" has been shown pursuant to 38 C.F.R. § 3.109(b) to extend the time limit for filing an NOD, then that part of the September 1993 BVA decision that denied entitlement to an effective date earlier than February 1, 1989, for the award of a 100% evaluation is vacated.

The Court remands those matters for expeditious readjudication on the basis of all evidence and material of record and applicable law and regulation, and for expeditious issuance of a new decision supported by an adequate statement of reasons or bases—all in accordance with this opinion and section 302 of the Veterans' Benefits Improvements Act of 1994, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994). *See* 38 U.S.C. §§ 7104(a), (d)(1); *Block v. Brown*, 7 Vet. App. 343 (1994); *see also* Memorandum from J. Gary Hickman, Director, Compensation and Pension Service to Director, VARO (Feb. 16, 1995) at 1, *Bond v. Brown*, U.S.Vet.App. No. 93–146 (notifying RO Directors of "Priority Handling of Remanded Appeals by the Court of Veterans Appeals or the [Board]" and requiring that "[a]djudication management [ ] ensure that all Court/BVA remanded cases are properly and timely handled upon receipt"); VA ADJUDICATION PROCEDURE MANUAL, M21–1, Part IV, paras. 38.02, 38.03 (providing for BVA and ROs to follow flagging procedure to afford "[s]pecial handling . . . for all cases remanded by the Court"). On remand, "the appellant will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant. The request of the appellant for oral argument is DENIED.

AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED IN PART.