BARTLEY, Judge,
with whom GREENBERG, Judge, joins in full, and SCHOELEN, Judge, joins as to part I, dissenting:
We cannot endorse the majority’s affir-mance of the June 2011 Board decision finding no CUE in the April 1988 RO implicit decision that Mr. Evans was not entitled to referral under 38 C.F.R. § 4.16(b) because no reasonable factfinder could have reviewed the evidence of record in April 1988 and reached that conclusion. All of the evidence pertinent to unemploy-ability unequivocally indicated that he was unable to secure and follow a substantially gainful occupation by reason of service-connected PTSD. Thus, unlike the majority, we would conclude that the Board’s finding that the RO in April 1988 did not undebatably err in failing to refer Mr. Evans’s case for consideration of extras-chedular TDIU was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. And, unlike the majority, we would reach the question of exceptional importance that originally prompted en banc review in this case: Whether such referral can constitute a manifest change in the outcome of a prior final decision sufficient to establish CUE? Therefore, we must respectfully dissent from the majority’s decision.
I. UNDEBATABLE ERROR
The Board found that the RO had not committed CUE in failing to refer Mr. Evans’s case to the Director of VA’s Compensation and Pension Service[12] for consideration of extrasehedular TDIU because the “evidence of record in April 1988 did not show that it was ‘absolutely clear’ or ‘undebatable’ that the [vjeteran was unemployable due to his PTSD.” R. at 14 (quoting Fugo v. Brown, 6 Vet.App. 40 43-44 (1993)). The Board explained that, although the record before the RO “contained medical evidence indicating that the [v]eteran was unemployable, the record also contained other medical evidence from which the RO could have concluded that he was not unemployable,” namely, the VA examination reports from Drs. Kirch, Basobas, and Garas. Id. According to the Board, those reports included “clinical findings indicating that the [v]eteran’s PTSD was less than totally disabling at that time,” from which the RO could have reasonably deduced that he was not unemployable. Id. (emphasis added). The majority sanctions that approach, concluding that the Board’s reliance on those reports to support its denial of the veteran’s CUE motion was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See ante at 188-89. But, contrary to the majority’s analysis, the VA examination reports cited by the Board cannot bear even the minimal weight that the Board placed on them.
One of the requirements for establishing CUE in a prior final decision is a showing that the RO or the Board committed an “undebatable” error in making that decision. Russell v. Principi, 3 Vet.App. 310, 313-14 (1992) (en banc). This standard is met by demonstrating that “no reasonable factfinder” could have reached the same conclusion that the RO or the Board reached in that decision based on the evi *198 dence then of record.[13] Joyce v. Nicholson, 19 Vet.App. 36, 48 (2005); see Russell, 3 Vet.App. at 313-14 (“The words ‘clear and unmistakable error’ are self-defining. They are errors that are undebatable, so that it can be said that reasonable minds could only conclude that the original decision was fatally flawed at the time it was made.”). Put another way, where all the evidence before the RO or the Board at the time of the disputed decision militates against the. conclusion reached therein, then an “undebatable” error has occurred. See Bouton v. Peake, 23 Vet.App, 70, 73 (2008); Crippen v. Brown, 9 Vet.App. 412, 422 (1996). That is precisely the situation in this case.
At the time of the April 1988 RO’s implicit decision not to refer the case, all of the pertinent evidence of record showed that Mr. Evans was no longer able to secure and follow a substantially gainful occupation by reason of service-connected PTSD.[14] That evidence indicated that Mr. Evans attempted to work as a farm foreman in May and June 1987 but had to quit that job “due to stress and panic attacks” (R. at 1185) that necessitated inpatient psychiatric care (R. at 1135). On July 23, 1987, he filed a claim for VA benefits for PTSD, to include entitlement to TDIU. R. at 1132-36. Four days later, he was admitted to a VA hospital with complaints of anxiety, panic attacks, violent nightmares, depression, paranoia, and a history of physical aggression. R. at 1162. Notably, upon admission he denied hallucinations, delusions, suicidal ideation, and aggressive thoughts and was found to be alert, fully oriented, and cooperative, with good speech, appropriate affect and mood, and fair memory, concentration, insight, and judgment. R. at 1164. After nearly two months of intensive inpatient therapy, Mr. Evans was still struggling with anxiety, panic attacks, sleep disturbances, aggressiveness, and violent behavior. Id. Yet, he requested to be discharged from the hospital and was granted that release against doctors’ orders. R. at 1164-65. The discharge summary stated:
It is felt that [Mr. Evans] is unemployable at this time in light of his continuing need for intensive out-patient treatment with the possibility of referral back for inpatient treatment should his out-patient therapist deem it appropriate. His employment status will be reassessed on a continuing basis as an out-patient and may be upgraded when felt appropriate.
R. at 1165. Along with the determination that he was unemployable, he was “considered competent to manage his own assets and income” and was cleared to “return to pre-hospital activities.” Id.
*199 The evidence of record before the RO in April 1988 also included three VA outpatient psychiatric examination reports, from VA Drs. Kirch, Basobas, and Garas, cited by the Board and the majority. The November 1987 VA report from Dr. Kirch and the January 1988 VA reports from Drs. Basobas and Garas contain findings nearly identical to those recorded in the September 1987 VA hospital discharge summary wherein Mr. Evans was found unemployable. See R. at 1146-47 (Dr. Kirch’s report reflecting panic attacks, anxiety, sleep impairment and disturbances, asocial and aggressive behavior, depression, and constant fear of death), 1128-29 (Dr. Basobas’s report reflecting panic attacks, anxiety, sleep impairment and disturbances, aggressive behavior, depression, nervousness, and constant fear of death), 1130-31 (Dr. Garas’s report reflecting panic attacks, anxiety, sleep impairment and disturbances, aggressive behavior, depression, anger, and constant fear of death). Although each of the VA examiners commented that Mr. Evans was not currently working because of PTSD symptoms (R. at 1128, 1131, 1146), none of the VA examiners opined on his unemployability. Critically, none of the VA examiners reassessed the veteran’s unemployability or “upgraded” his employment status as directed in the September 1987 VA hospital discharge summary. R. at 1165.
The foregoing is a complete list of the evidence before the RO in April 1988 that postdated Mr. Evans’s application and predated its decision. That evidence unequivocally showed that the veteran attempted to work in May and June 1987 but could not maintain that employment due to PTSD (R. at 1135, 1185); he sought VA inpatient treatment for that condition in July 1987 and, upon discharge in September 1987, was deemed indefinitely unemployable due to PTSD, subject to periodic reevaluation on an outpatient basis (R. at 1162-65); and the three VA examiners who subsequently provided outpatient psychiatric treatment did not conclude that his PTSD had improved to the point that he was employable (R. at 1128-31, 1146— 47).
Given this evidence, no reasonable fact-finder could have concluded — as the RO implicitly did in April 1988 — that Mr. Evans’s case was not due referral to the Director for extraschedular TDIU consideration. Thus, contrary to the majority’s conclusion (see ante at 188-89), the Board’s finding that the RO did not commit CUE in April 1988 in failing to refer the case was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Russell, 3 Vet.App. at 315 (setting forth the Court’s standard of review for Board decisions addressing CUE).
None of the evidence cited by the Board or discussed by the majority compels a different conclusion. As the Board noted in its decision, November 1987 and January 1988 VA examiners did not comment on Mr. Evans’s unemployability (R. at 10), and, as discussed above, those examiners did not indicate that the veteran’s PTSD had improved since a VA psychiatrist’s September 1987 assessment that he was unemployable (R. at 1165).[15] At most, the *200 November 1987 and January 1988 VA examiners addressed Mr. Evans’s employment history, but their statements on that topic unambiguously indicate that he was unable to maintain a job due to PTSD. See R. at 1128 (Dr. Basobas: “After [the veteran’s] discharge from the service, he had several jobs but was not able to1 handle them for long periods of time because of anxiety, panic attacks, and his behavior.”), 1131 (Dr. Garas: “[The veteran’s] last permanent job was in 1983. He worked for a month or two in 1987 but had to quit because of stress.”), 1146 (Dr. Kirch: “Following service, [the veteran] did warehouse work in Seattle for two and a half years ... and then has worked in construction and odd jobs all over the United States for brief periods.... He has been married on two occasions, both marriages broke up because of his condition and his inability to work.”). Therefore, the only evidence before the RO in April 1988 unambiguously indicated that the veteran was unemployable by reason of service-connected PTSD and, on that record, no reasonable factfinder could have concluded that Mr. Evans was not entitled to referral to the Director for consideration of extraschedular TDIU. See Joyce, 19 Vet.App. at 48.
Nevertheless, the majority attempts to salvage the Board decision by noting that the version of 38 C.F.R. § 4.132 in effect in April 1988 under which Mr. Evans was evaluated “considered the effects of PTSD and employability explicitly.” Ante at 188 n. 4. However, the RO’s assignment of a less than total schedular evaluation under § 4.132 does not preclude the possibility that the veteran was unemployable and entitled to TDIU. See 38 C.F.R. § 4.16(a) (1987) (authorizing TDIU “where the sche-dular rating is less than total” and the veteran is “unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities”); see also Guerra v. Shinseki, 642 F.3d 1046, 1047-48 (Fed.Cir.2011); Vettese v. Brown, 7 Vet. App. 31, 34-35 (1994). The majority also states that the RO in 1988 could have equated competency with employability (see ante at 187), but the regulation concerning the evaluation of psychiatric disabilities in effect at the time of the April 1988 RO decision explicitly prohibited such a finding. See 38 C.F.R. § 4.130 (1987) (“[T]he fact will be borne in mind that a person who has regained competency may still be unemployable.”).
The Secretary argues that there was support in the record for the RO’s implicit finding that Mr. Evans’s PTSD did not make him unemployable because it contained a September 1986 pre-employment physical examination finding the veteran “[acceptable for any kind of work for which he is qualified.” R. at 1191; see Secretary’s Br. at 14-15.
This evidence shows Mr. Evans employable in September 1986,10 months prior to his July 1987 application for benefits and one year prior to the September 1987 finding that he was unemployable. As outlined above, the evidence of record that postdates the September 1986 physical examination report indicates that, as of June 1987, he was unable to continue working as a farm foreman due to PTSD (R. at 1135, 1185); in July 1987, he submitted his application for VA benefits for PTSD (R. at 1133-36) and was hospitalized for two months, receiving inpatient psychiatric treatment (R. at 1162-65); and, in September 1987, he was deemed unemployable due to PTSD (R. at 1165). There is no *201 other evidence of record that postdates the September 1986 examination report but predates the April 1988 RO decision that is pertinent to the veteran’s entitlement to referral to the Director.
Therefore, even if the Secretary is correct that the RO could have considered the September 1986 physical examination report in determining entitlement to referral, the uncontroverted evidence before the RO in April 1988 showed that, after September 1986, Mr. Evans’s PTSD worsened to the point that it rendered him unemployable at least through the date of the RO decision, and therefore entitled to referral. The September 1986 physical examination reports — which was performed during a time when Mr. Evans does not assert that he was unemployable (see R. at 1185), before his mental disorder worsened (R. at 1162-65, 1185), and before he even filed his claim for service connection for PTSD including entitlement to TDIU (R. at 1133— 36) — does not reflect whether he was unemployable due to PTSD when he filed his claim or during the pendency of that claim.
In sum, the only evidence of record in April 1988 pertinent to Mr. Evans’s entitlement to referral under § 4.16(b) at the time he filed his claim for VA benefits unequivocally established that he was unable to secure and follow a substantially gainful occupation by reason of service-connected PTSD, and therefore entitled to referral. Despite the assertions of the Board, the Secretary, and the majority, there is no evidentiary basis upon which a reasonable factfinder could have reached a contrary conclusion. The record thus speaks for itself and compels the conclusion that the RO undebatably erred in failing to refer Mr. Evans’s case to the Director for consideration of extraschedu-lar TDIU. Therefore, we would find that the Board’s decision that the April 1988 RO decision did not contain CUE because “[t]he evidence of record in April 1988 did not show that it was ‘absolutely clear’ or ‘undebatable’ that the [vjeteran was unemployable due to his PTSD” was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See Russell, 3 Vet.App. at 315.
II. MANIFEST CHANGE IN THE OUTCOME
Because the Board and the majority both concluded that the evidence before the RO in April 1988 did not undebatably establish that the RO had erred in failing to refer Mr. Evans’s case for consideration of extraschedular TDIU, they did not address whether such referral could constitute a manifest change in the outcome of the RO decision sufficient to establish CUE. See R. at 14; ante at 189-90. However, given our conclusion in part I above, we will now address that issue.
In Russell, the Court held that CUE is “the sort of error which, had it not been made, would have manifestly changed the outcome at the time it was made.” 3 Vet.App. at 313. The Court explained that, “[ejrrors that would not have changed the outcome are harmless” because, “by definition, such errors do not give rise to the need for revising the previous decision.” Id.; see Bustos v. West, 179 F.3d 1378, 1381 (Fed.Cir.1999) (holding that, “to prove the existence of CUE ..,, the [movant] must show that an outcome-determinative error occurred, that is, an error that would manifestly change the outcome of a prior decision,” and that CUE involves a “dispositive impact on the ultimate outcome” (emphasis added)); Fugo, 6 Vet.App. at 43-44 (“[E]ven where the premise of error is accepted, if it is not absolutely clear that a different result would have ensued, the error complained of cannot be, ipso facto, clear and unmistakable.”).
*202 In the years since Russell, the Court has clarified what is necessary for an error to have manifestly changed the outcome of a prior final decision. In Mason v. Brown, 8 Vet.App. 44, 53 (1995), the Court concluded that, for an error in a prior RO decision denying service connection for a nervous condition to constitute CUE, correction of that error must result in a grant of service connection for that condition. The next year, in Crippen v. Brown, 9 Vet.App. 412, 422 (1996), the Court expanded on this formulation of the requirement, holding that only “a change in the merits outcome” of the decision being collaterally attacked would support a finding of CUE. The Court explained that, “[Requiring a change in the merits outcome preserves the finality of the VA adjudication process except where substantive rights would be adversely affected if an undebatable adjudication error were not corrected.” Id. The Court applied the change-in-the-merits-outcome standard to the facts of that case and held that, to succeed on a CUE motion attacking a prior decision that had denied reopening of a claim, it was necessary for the movant to show not only that, but for the error, he or she would have been entitled to reopening but also that the underlying claim for benefits would have been granted. Id. at 422-23.
Since Crippen, the Court has adhered to the change-in-the-merits-outeome standard. See, e.g., Joyce, 19 Vet.App. at 53 (explaining that, to establish CUE in that case, the movant had to show that “the outcome would have been manifestly different, that is, that service connection by aggravation would undebatably have been awarded in 1955 had the RO not erred regarding the presumption of aggravation”); Lane v. Principi, 16 Vet.App. 78, 82-83 (2002) (rejecting the appellant’s argument that “a successful CUE challenge should demonstrate either reversible error or prejudicial error” because requiring only a “‘significant revision of the challenged decision’ ” that does not result in a change in the merits of the underlying decision would “not manifestly change the decision’s outcome”); Rivers v. Gober, 10 Vet.App. 469, 473 (1997) (explaining that, to establish CUE in that case, the movant had to show that “the result of the claim on the merits would have been manifestly different (i.e.[,] the RO would have considered and awarded service connection)”); see also Cook v. Principi, 318 F.3d 1334, 1344-45 (Fed.Cir.2002) (en banc) (holding that a breach of the duty to assist cannot constitute CUE because an error in development does not compel reversal and is therefore not outcome determinative).
However, we are persuaded that the unique adjudicatory scheme for extrasche-dular TDIU sets Mr. Evans’s situation apart from those CUE cases and compels a modification of the change-in-the-merits-outcome standard in this instance. Be- ' cause an RO adjudicator by regulation is unable to initially reach the merits of ex-traschedular TDIU, all that should be needed to establish a manifest change in the outcome of a prior RO decision that failed to refer a case to the Director for consideration of extraschedular TDIU is a showing that, but for the CUE, referral would have occurred, not that there would have been an ultimate award of extrasche-dular TDIU. Russell and its progeny are distinguishable because they addressed situations where the adjudicator at the time the CUE was made would have had the ultimate authority to initially make a merits determination.
This is true even for the CUE challenge in Crippen, which required the additional step of reopening before the adjudicator could proceed to the merits of the underlying claim. 9 Vet.App. at 423. The critical fact that distinguishes Crippen from the instant appeal is that the adjudicator in *203 Crippen possessed the authority to make a merits determination at the time the decision being collaterally attacked was issued, that is, he or she had authority to both reopen and grant the underlying claim for benefits. See id. at 421 (“[IJf an RO decision, assailed as CUE, had undebatably erred in denying the reopening of a previously and finally disallowed claim, the Board would have to decide whether, had the error not been made, the outcome after reopening — that is, on the merits— would have ‘manifestly been changed.” (citing Mason, 8 Vet.App. at 52)).
That is simply not the case here: Although the RO had the authority to refer the case to the Director in April 1988 for consideration of extraschedular TDIU, it lacked the authority to reach the merits of extraschedular TDIU and award that benefit in the first instance. See 38 C.F.R. § 4.16(b) (1987) (“[R]ating boards should submit to the Director, Compensation and Pension Service!,] for extra-schedular consideration all cases of veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in paragraph (a) of this section.”); see also Bowling v. Principi, 15 Vet.App, 1, 10 (2001) (holding that § 4.16(b) vests authority to award extraschedular TDIU in the first instance solely with the Director); VA Adjudication Procedures Manual Rewrite (M21-1MR), pt. Ill, subpt. iv, ch. 6, § B.5.b. (“Only the Director ... may approve extra-schedular evaluations in compensation cases submitted under 38 C.F.R. [§ ] 3.321(b)(1) and 38 C.F.R. [§ ] 4.16(b).”).
Therefore, applying the unique adjudicatory scheme created by § 4.16(b) to this case provides distinguishing circumstances from our prior precedent requiring that a manifest change in the outcome necessarily result in a grant of the underlying benefit sought. This is because under § 4.16(b), referral, not a merits determination, was the greatest relief that the RO had the authority to provide Mr. Evans in April 1988. Requiring Mr. Evans to prove entitlement to referral only and not success on the merits provides precisely what Russell and its progeny require to demonstrate a manifest change in the outcome: a grant of the greatest relief the RO could offer at that time with respect to the ex-traschedular TDIU benefit.
Because this analysis is in a CUE context, our conclusion that Mr. Evans was undebatably entitled to referral would appear to leave the Director, if remand were to occur, little flexibility in his or her consideration of extraschedular TDIU. However, although the Secretary stated that the standard for referral is the same as for an extraschedular TDIU award, and the language of § 4.16 supports that statement, we are not convinced at this time that referral to the Director would be unnecessary were the majority to find that the Board decision was arbitrary and capricious in finding no CUE in the April 1988 RO implicit decision not to refer. The only helpful information on the role of the Director in extraschedular TDIU consideration was gleaned at oral argument, where the Secretary briefly explained that the purpose of having the Director undertake extraschedular TDIU consideration was to review the RO’s front-line initial determination of unemployability to provide consistency, correctness, and accuracy of those decisions; to provide expertise; and to exercise judgment and experience. Oral Argument Transcript at 1:26:10, 1:26:58. Given this specific information, and considering the regulatory process required by § 4.16(b), we are reluctant to conclude at this time that there can be no value added by Director consideration; at the very least, so concluding appears premature.
*204 The posture of Mr. Evans’s case in this Court also weighs against deciding that issue; we are reviewing a Board decision that found no CUE in the April 1988 RO implicit decision as to referral, a decision that the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) termed a “threshold inquiry” and a “condition precedent” to referral to the Director. Thun v. Shinseki, 572 F.3d 1366, 1370 (Fed.Cir. 2009). Questions as to whether Director action is necessary and the Director’s role and obligations if Mr. Evans’s case were properly referred are not before us.[16]
Our approach as to manifest change in outcome is consistent with Federal Circuit decisions that have identified CUE on the part of the RO even where it was unclear, without further RO or Board action, whether the veteran ultimately would be successful on the underlying merits of the claim. These decisions may be viewed as limited exceptions to the requirement that there must be a manifest change in outcome on the merits. For example, in Roberson v. Principi, 251 F.3d 1378, 1384-85 (Fed.Cir.2001), the Federal Circuit held that the RO’s failure to sympathetically read the filings of a pro se veteran to include a request for TDIU could constitute CUE and remanded for “a determination of [the veteran’s] eligibility for TDIU.” In Moody v. Principi, 360 F.3d 1306, 1310 (Fed.Cir.2004), the Federal Circuit, in the context of a CUE motion, remanded for a “factual” determination as to “whether [the veteran] made an informal claim for secondary service connection.”
These decisions support our view that particularly here, where there is a singular adjudicatory scheme that stands apart from the norm and the RO is initially unable to reach the merits and grant entitlement to extraschedular TDIU, it is necessary to construe a referral to the Director for consideration of extraschedular TDIU as a manifest change in the outcome of the prior RO decision. To adopt the Crippen manifestly-different-outcome-on-the-merits definition here could work to insulate a denial of referral for extrasche-dular TDIU from a CUE challenge. The Secretary has offered, and the Court can discern, no reason for singularly excluding the issue of referral for extraschedular TDIU from the rare- but important CUE exception to the rule of finality.[17]
We believe that this clarification of what may constitute a manifest change in outcome as it pertains to CUE in extrasche-dular TDIU cases strikes the proper balance between the importance of preserving the finality of prior decisions, see Cook, 318 F.3d at 1339 (“The purpose of the rule of finality is to preclude repetitive and belated readjudication of veterans’ benefit claims.”), and the protection of a veteran’s *205 substantive rights in pursuing all the benefits to which he or she is legally entitled, see Crippen, 9 Vet.App. at 422 (“Requiring a change in the merits outcome preserves the finality of the VA adjudication process except where substantive rights would be adversely affected if an undebatable adjudication error were not corrected.”). When these two principles conflict, the pro-claimant nature of the veterans benefit system, as well as our utmost respect and gratitude for the tremendous sacrifices made by veterans and their families, must always be resolved in the veterans’ favor. See Henderson ex rel, Henderson v. Shinseki 562 U.S. 428, 131 S.Ct. 1197, 1205, 179 L.Ed.2d 159 (2011) (“The solicitude of Congress for veterans is of long standing. And that solicitude is plainly reflected in the [VJRA], as well as in subsequent laws that place a thumb on the scale in the veteran’s favor in the course of administrative and judicial review of VA decisions.” (internal citations and quotation marks omitted)).
III. CONCLUSION
In this case, proper application of the version of § 4.16(b) extant in April 1988 to the evidence of record at that time shows undebatably that Mr. Evans was entitled to referral to the Director due to his inability to secure and follow a substantially gainful occupation by reason of service-connected PTSD. The determination that referral was required is a manifest change in the outcome because the RO lacked the authority to reach the merits of extrasche-dular TDIU — referral was the greatest relief that the RO could provide. The failure to refer thus constitutes CUE and the June 2011 Board decision finding to the contrary was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, we must respectfully dissent from the majority’s affirmance of the Board decision.

. The Compensation and Pension Service was renamed the Compensation Service in January 2014. See VA Compensation Service and Pension and Fiduciary Service Nomenclature Changes, 79 Fed.Reg. 2,099, 2,099 (Jan. 13, 2014). For the sake of clarity, we will hereinafter refer to the Director of VA’s Compensation and Pension Service simply as the "Director.”

. Contrary to the majority's assertion (see ante at 188-89), it is not necessáry to show that the RO did not consider a particular fact or law to establish CUE in an RO decision before February 1990 because, in Russell, the en banc Court recognized that "an erroneous factfinding” could form the basis for a finding of CUE in such a decision. 3 Vet.App. at 319.

. The majority accuses us of impermissibly reweighing the evidence before the RO (see ante at 187-88), but our discussion of the evidence does not involve any weighing at all. As in Bouton, we are delineating the evidence before the RO to show that no evidence whatsoever supported the RO’s implicit finding that Mr. Evans was not unemployable and that the Board’s finding that that decision did not contain CUE was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 23 Vet.App. at 72-73 (describing the evidence before the RO to show that "there was no evidence before the RO that could have supported a denial of the service-connection claim” and reversing the Board decision finding no CUE in that RO decision). No weighing of the evidence is necessary where, as here, "there was no basis in the record” for the RO’s decision. Id. at 73.

. The majority’s reading of the September 1987 hospital discharge summary is untenable. Although the hospital discharge summary indicated that Mr. Evans "may return to pre-hospital activities” (R. at 1165), that statement cannot reasonably be construed as evidence that he was employable. See ante at 187. The sentence that immediately follows that statement clearly indicated that "the patient is unemployable at this time in light of his continuing need for intensive out-patient treatment with the possibility of referral back for inpatient treatment.” R. at 1165. Given this explicit finding that Mr. Evans was unemployable, the majority's assertion that the hospital discharge summary’s statement that the *200 veteran may return to pre-hospital activities "included employment" (ante at 188 n. 5) is patently incorrect.

. We note, however, that the insertion of the Director in the extraschedular TDIU adjudicatory scheme may raise concerns similar to those addressed in Military Order of Purple Heart v. Sec’y of Veterans Affairs, 580 F.3d 1293 (Fed.Cir.2009).

. We join our dissenting colleague, Judge Schoelen, in noting that 38 C.F.R. § 3.105(a), the regulation governing CUE challenges to RO decisions, contains broad, nonlimiting language as to the types of issues decided by the RO that may later be subject to reversal or revision on the basis of CUE — such as age, marriage, relationship, dependency, and line of duty — and not all of those issues necessarily impact a claimant's ultimate entitlement to benefits. See 38 C.F.R. § 3.105(a) (2014); ante at 194. The basis of our dissent, however, is the unique adjudicatory scheme applicable to extraschedular TDIU, not the language of§ 3.105(a). Although we find Judge Schoe-len’s view enticing, neither party briefed or fully argued whether a change in the interpretation of the manifest-change-in-outcome requirement for CUE is due, and we do not address that issue.